GULF, COLORADO & SANTA FE RAILWAY COMPANY
. V. M. S. JOHNSON ET AL.

No. 696.

1. **Railway Company—Defective Roadbed Causing Wreck—Proof Held Sufficient.**—See the opinion for evidence held sufficient to show that a defective stock gap in the track of the defendant railway company caused a wreck resulting in the death of a brakeman, and to establish negligence on the part of the company with reference to keeping such stock gap in repair.

2. **Death by Wrongful Act—Evidence Under General Denial.**—Where, in an action against a railway company for death of a person occasioned by the wreck of a train, the defendant, by its general denial pleaded, puts in issue every material fact, testimony as to the manner of the deceased's death, showing the bruised condition of the body when found, was not inadmissible, because likely to inflame the jury.

3. **Same—Expectancy of Life—Mortality Tables.**—Mortality tables proven by life insurance agents to be those generally used and relied on in life insurance business, and showing the life expectancy of men, without regard to their avocation, are admissible in evidence.

4. **Verdict Not Excessive.**—A verdict of $14,500 against a railway company for negligently causing the death of a strong, healthy, temperate, industrious man, 29 years old, with a life expectancy of 36 years, earning $65 per month as head brakeman in the railway service, most of which he appropriated to the benefit of his wife and infant child, who were solely dependent upon him, held not excessive.

5. **Damages—Apportionment.**—The defendant can not complain of the apportionment of damages as between plaintiffs, the wife and child of the person whose death it has caused, where the total amount of the damages recovered is not excessive.

APPEAL from Johnson. Tried below before Hon. J. M. HALL.

*J. W. Terry,* for appellant.—1. The witness failed to qualify himself to speak as to the expectancy of the said A. D. Johnson, and there was no evidence to show that the table was a correct mortality table, and that it applied to the expectancy of a freight brakeman.

2. The verdict of the jury is grossly excessive in amount, and the amount thereof is unsupported by the evidence. Railway v. Johnson, 20 S. W. Rep., 1123; Railway v. Long, 22 S. W. Rep., 747.

*Poindexter & Padelford,* for appellees.—1. The amount of damages to be recovered, and which is recovered in a case, is a fact as clearly and exclusively within the province of the jury to decide as any other fact in a case, and especially under the statute governing the character of damages in this case; the law being, "that the jury may give such damages as they may think proportional to the jury resulting from such death." Railway v. Smith, 65 Texas, 166; Railway v. Lehmberg, 75 Texas, 67–69; Railway v. Maddry, 58 Am. and Eng. Ry. Cases, 331–336; 21 S. W. Rep., 472; 57 Ark., 306; Tilley v. Railway, 29 N. Y., 252; Railway v. Wightman, 27 Grat. (Va.), 431; Beeson v. G. M. & M. Co., 57 Cal., 37; Searle v. Railway, 32 W. Va., 370; Railway v. Keller, 67 Pa. St., 300; Monroe v. Dradging, 84 Cal., 315; Railway v. Kelley, 24 Md., 271; McIntyre v. Railway, 37 N. Y., 289; Railway v. Left, 26 Am. and Eng. Ry. Cases, 454; Tiffany Death by Wrongful Act, secs. 158, 159, pp. 185, 186; Wheeler v. Railway, 52 N. W. Rep., 119; Kelley v. Railway, 48 Fed. Rep., 663; Stoker v. Railway, 4 S. W. Rep., 389.

2. Standard mortality tables, and the testimony of experts in connection therewith, showing the probable duration of the life of a deceased, are always admissible in evidence in such cases as this. Railway v. Bennett, 76 Texas, 151; Railway v. Douglass, 69 Texas, 699.

3. It was not admitted by the defendant on the trial of this case that the deceased was killed by the wreck, and every fact and circumstance tending to establish that issue was admissible. Neil v. Keese, 5 Texas, 32; Hunter v. Lanius, 82 Texas, 683; Day v. Stone, 59 Texas, 613; Horton v. Reynolds, 8 Texas, 284; Shays v. Baker, 22 Texas, 316; Railway v. Douglass, 23 Texas, 329.

FINLEY, ASSOCIATE JUSTICE.—This suit was brought on February 19, 1887, by the appellees, Mrs. M. S. Johnson, in her own right, and as the next friend of her minor son, Murdie Lee Johnson, against appellant, the Gulf, Colorado & Santa Fe Railway Company, for damages resulting from the death of A. D. Johnson, who was the husband of the plaintiff Mrs. M. S. Johnson, and the father of the plaintiff Murdie Lee Johnson, which death was alleged to have been caused on January 22, 1887, by the negligence of the defendant. The deceased was alleged to have been in the employ of the defendant as brakeman on one of its trains on and prior to January 22, 1887; that on and prior to said date a stock gap on defendant's road between Cleburne and Alvarado had

been by the defendant negligently allowed to become defective and unsafe and dangerous for trains of cars to pass over, and that by reason of said defects and unsafe condition of said stock guard or track, the train of cars of the defendant on which the deceased was working as such brakeman was wrecked, and the said A. D. Johnson was killed; that the negligence of the defendant consisted in allowing the timbers in said stock gap and the material therein to rot and decay, and also in negligently allowing said stock gap to become burned and injured by fire to such an extent that the same and the railroad track thereon was rendered unsafe for trains of cars to pass over; all of which was known to the defendant, or could have been known to the defendant by the use of ordinary diligence prior to January 22, 1887, and that the same was unknown to, and could not by the use of ordinary diligence have been known to the deceased prior to and at said time; that at the time of his death deceased was only 29 years of age, was of sound body and mind, a good brakeman, etc., and was at said time receiving $65 per month as wages, with prospects of an increase in his wages, etc. That the plaintiff Mrs. M. S. Johnson was 27 years of age, and the plaintiff Murdie Lee Johnson 2 years of age at the time of the death of said A. D. Johnson, and that both of them were sound in body and mind, and were dependent upon deceased for support and maintenance, education, etc.

Plaintiffs further alleged in their petition, that they were the proper parties to sue for damages resulting in the death of said A. D. Johnson, which was caused by the negligence of the defendant.

The defendant answered only by exceptions to the pleadings, and general denial.

The case was first tried in May, 1888, and on that trial plaintiffs recovered a verdict and judgment against defendant for $18,000, from which an appeal was taken, and the judgment of the court below was by the Court of Civil Appeals at Fort Worth reversed, on account of excessiveness of the verdict. The case was tried again on May 15, 1893, and plaintiffs recovered another verdict for $14,452.50, upon which the court rendered a judgment, and from which last judgment this appeal is taken.

The evidence without conflict established, that A. D. Johnson was the husband and father respectively of Mrs. M. S. Johnson and Murdie Lee Johnson, plaintiffs; and that he was killed in a wreck upon the defendant's railroad, while in its employ as a brakeman. That he was 29 years old at the time he was killed, and that the wife and the son, plaintiffs, were respectively 27 and 2 years old. That the deceased was a stout, healthy man, of fine physique, with a life expectancy of 36 years, and was at the time of his death receiving a salary of $65 per month as brakeman, and that most all of his earnings were expended for the benefit of his wife and child.

The only issues of fact upon which there is any contest are these: (1) Was the death of A. D. Johnson caused by the negligence of the

railway company? (2) What amount of damages have the plaintiffs sustained resulting from the death of A. D. Johnson?

Upon these issues we deduce from the evidence the following conclusions:

1. The derailment of the car causing the death of Johnson was occasioned by a defective stock gap placed in the roadbed of the defendant company. The timbers placed in the stock gap had become old and rotten and unsafe for cars to pass over. The timbers in the stock gap had several times previous to the accident caught fire, and were thereby greatly weakened; and at the time of the accident the stock gap was so out of repair and insufficient, from one or both of these causes, that it could not support the weight of the train, and in consequence thereof gave way, causing derailment of the cars, and the death of said Johnson.

2. The timbers in the stock gap had been rotten and weakened by fire, and thereby rendered unsafe, a sufficient length of time prior to the accident for the person charged with the duty of keeping the track in good condition to have ascertained its condition and repaired it, so as to have prevented the derailment, and were guilty of negligence in allowing it to remain in that condition.

3. Plaintiffs sustained pecuniary loss and damages to the extent of the sums awarded them respectively by the verdict of the jury.

*Opinion.*—The first assignment of error presented in the brief of appellant is as follows: "Because the verdict of the jury is contrary to the evidence, and not supported by the evidence, in this: The evidence fails to show that the fire was allowed or permitted to negligently escape from defendant's engine; and the evidence fails to show that at the time of such fire the defendant's agents or employes had negligently allowed combustible material to accumulate on defendant's right of way; and because the evidence fails to show that the timbers or any of them in the stock guard where the accident is alleged to have occurred were so rotten and decayed as to be insufficient to support defendant's train, and because the evidence shows that the fire occurred without any fault or negligence of defendant, but from some unknown cause, after nightfall, on the night of January 21, 1887, and that the wreck occurred early in the morning of January 22, 1887; and there was no evidence to show that any of defendant's employes charged with the duty of caring for the track did know of the fire or could have know of the same, or did know that the stock gap had been burned out, or could have known the same prior to said wreck, and in time to have prevented the accident; and the evidence fails to show that the defendant was guilty of any negligence whatever proximately contributing to the accident; and in all of the foregoing particulars defendant says, as a further ground of this assignment, that the verdict of the jury is against the manifest weight and great preponderance of the evidence."

No proposition of law is propounded under this assignment, but the assignment itself is asked to be treated as such. The assignment complains that the verdict is not supported by the evidence in several particulars, and is not as distinct and specific as is contemplated by the rules. We will, however, consider it as challenging the sufficiency of the evidence relating to negligence to sustain the verdict.

The only alleged ground of negligence which was submitted by the court to the jury for their determination was, that "defendant's line of railway * * * was out of repair and defective by reason of the timbers of one of its stock guards being burned out, or being decayed or rotten," etc.

The first part of the assignment, relating to the accumulation of grass and combustibles near the track and setting same on fire by allowing sparks to be emitted from the engines, etc., is directed at an issue of negligence not passed upon by the jury, and therefore is not involved in the verdict. The issue of negligence upon which the case was tried was the defective condition of the stock guard, resulting from the rottenness of the timbers and the effects of fire thereupon, and the failure of defendant to repair in time to prevent the injury. That is, the issue was whether or not the stock guard which caused the death of the deceased was, by reason of its defective condition, a violation of the duty which defendant owed to the deceased to use reasonable diligence in furnishing a safe roadbed. The uncontradicted evidence in this case shows, that the deceased came to his death by reason of a defective stock guard; that is, that the train was derailed and wrecked by reason of a defective stock guard on the defendant's road, which produced the death of deceased, and the proof shows that this stock guard was defective, in that the same was rotten or decayed, and had been consumed or partially consumed by fire. On this point Frank Crow testified, that he had lived near the place where the wreck occurred for ten years prior thereto, and that he had passed along by this stock gap, causing the death, frequently before; that the cross railing was pretty well rotten in the stock gap before the fire. He could not say how long they had been rotten. He and a young man walked along by there perhaps a week before the wreck, and he, the young man, just remarked, "We will not walk across there [meaning the stock gap], because it looks like some of them will break." "It was this shelly and sappy kind of timber, and looked like it was bursted out, and for this reason I thought it would break. This was three or four days before the wreck, and he had seen this stock gap in its rotten condition for a month prior thereto.".

Luther Jones, who lived somewhere about 225 yards from the place of the wreck, and who was present just after the wreck, testified, that the wreck was caused by a defective stock guard breaking in with the train, on account of the condition of the ties in the stock guard by reason of being rotten before the wreck.. "The condition of the track where the wreck occurred was pretty bad. A large majority of the

ties were rotten, some of them broken in two. I saw the stock gap frequently before the wreck. This was the condition of the stock gap some time before the wreck."

John Solomon testified, that he lived near said stock gap at the time and before the wreck; that at and before the wreck the timbers of the stock gap were considerably rotten, and some about rotted out, and that he had noticed this bad condition of the stock gap about two months before the wreck. That he noticed it in passing along the railroad.

L. Leach, who lived within sixty rods of the stock gap, testified, that he passed by there most every day, and that for three or four months before the wreck the ties across the cattle guard which caused the wreck were rotten, and he noticed that the north end of about four of them were rotten; that he noticed this a good many times, and thought they (meaning defendant's agents) were careless in leaving them that way. One of them was so rotten that it broke off on the north end, and the other ties were half rotten and hollow, and there was a space as wide as his hand, all rotten. They were that way he thought about three months before the wreck, and so far as he knew they were in the same condition at the time of the wreck. The witness further testified, that on one occasion a steer went through that stock gap and broke one of these rotten ties off, and some two or three were rotted about half of their length, and some of them were broken off as wide as his hand; that he did not think the hearts of these ties were sound. They were rotted as far as he could see all through, but he did not examine them particularly. They were pine ties.

Thomas Jones testified, that he saw the stock gap once and sometimes twice a week before the wreck; and that the cross pieces in this stock gap were rotten. Just on the edge of the rails were rotten. He did not examine to see the extent of the rottenness.

So this testimony shows that this stock gap was in a rotten and very defective condition for at least two months before the wreck.

The testimony also shows, that this stock gap was burned out and was on fire a sufficient length of time prior to the wreck for defendant's agents in charge of the track to have discovered said fire before the wreck. On this point all of the witnesses who were present at the wreck testified that there was fire in the stock gap, and that a large portion of it had been burned out at the time of the wreck; that the wreck was caused by this defective stock gap. The witness Leach testified, that there had been fire there a week before the wreck. The witness Luther Jones testified, that he saw fire there a week before the wreck, and also that the stock gap was on fire the evening before the wreck; that on the evening before the wreck he passed there, and this stock gap was smoking and burning on what he called the mud-sills, that is, the pieces right on the ground; that the cross pieces had burned out, and the railing was lying on the mud-sills. The witness Solomon testified, that he saw fire in the stock gap where the wreck

occurred, two days before the wreck; and he further testified, that he saw it three times while it was burning, that is, from two days up to the wreck he saw it burning three times. Tom Jones testified, that he saw fire there about 12 o'clock before the wreck occurred next morning. M. S. Solomon says, that he saw the fire burning in the stock gap at 2 o'clock a. m. The next time he saw it, it had burned pretty low; had burned pretty well all the wood timbers under the railing.

McGarth, the section boss of defendant, whose duty it was to see that this stock gap was in good condition, testified, that a fire had occurred there at this stock gap about a week before, but he never noticed any fire in there at that time, and that it was safe at the time he went over it; that he traveled over this part of the road two or three times a week on a hand car. He could not state how long before the wreck that he went over the stock gap, but he reckoned it was a day or so before the wreck; that it was his duty to examine this part of the road, and to examine the stock gaps and bridges, and to watch all of them, and anything that could be repaired, to report it to the company. He stated, he traveled over this portion of the road on a hand car. He further testified, that he walked over the road, but could not tell how long it was before the fire that he had done so; that he generally stopped at all of the stock gaps, but he did not know about this one. He stated, that if this fire he saw there about a week before the wreck had burned inside of that stock gap, he did not recollect it. He further swore, that he did not recollect sending a man over that part of the road the day before the wreck, but that it was his duty as the agent of the defendant to send a man over that portion of the road every day, but he did not remember whether or not it was done that day or any other day.

Nelson, the superintendent of bridges of defendant, testified, that the last time he went over that portion of the road was three or four weeks before the wreck.

We think the evidence fairly warranted the verdict of the jury that the defendant was guilty of negligence in permitting the stock guard to be in the condition to cause the wreck, and we so conclude. Tinsley v. Dowell, 26 S. W. Rep., 946; Clark & Loftus v. Pearce, 80 Texas, 146; Railway v. Laverty, 4 Texas Civ. App., 74; Owens v. Railway, 57 Texas, 681; Young v. Read, 25 Texas Supp., 118; Adams v. George, 25 Texas Supp., 376; Howard v. Ray, 25 Texas, 91; Baldridge v. Gordon, 24 Texas, 288; Anderson v. Anderson, 23 Texas, 640; Gamage v. Trawick, 19 Texas, 65; Chevaillier v. Denson, 8 Texas, 439; Mitchell v. Matson, 7 Texas, 4; Briscoe v. Bronaugh, 1 Texas, 340.

While on the stand as a witness, Mrs. Johnson was asked by her counsel this question: "How did A. D. Johnson seem to be killed? Did he have any bruises on him, or anything of the kind?" Appellant's counsel objected, upon the ground "that the evidence was calculated to inflame the minds of the jury and to prejudice their minds

against defendant." The court overruled the objection, and the witness answered, "His face was all bruised and bloodshot, and he looked like when he was thrown from the wreck he might have been thrown upon his face." The defendant had not admitted that the deceased was killed in a wreck of its cars; its general denial put every material allegation in issue, and the testimony was admissible as tending to show how the deceased came to his death. The court carefully limited the jury in the assessment of damages to the pecuniary loss and damage sustained, and it is hardly conceivable that this evidence would so inflame or prejudice the minds of the jury as to lead them into other elements of damage, in contravention of the charge of the court. The assignment is without merit.

Assignments nine, ten, eleven, and twelve are based upon the action of the court in admitting in evidence certain mortality tables, which showed that the life expectancy of a man 29 years old was 36 3-100 years. This evidence was objected to upon two grounds: (1) The witnesses who produced the books had not qualified themselves to testify as to the tables therein contained; (2) the tables did not show the expectancy of a brakeman.

The witnesses testified, that they were life insurance agents; that the tables were those generally used and relied upon in the life insurance business; that they had no personal knowledge of their correctness. The tables showed the life expectancy of men, without regard to their avocations. The evidence was admissible. Railway v. Bennett, 76 Texas, 151; Railway v. Compton, 75 Texas, 667; Railway v. Putman, 118 U. S., 554; Coal and Railway Co. v. Chandliss, Am. and Eng. Ry. Cases, 254; O'Mellia v. Railway, 21 S. W. Rep., 503; Railway v. Douglass, 69 Texas, 699.

It is urged that the verdict is excessive, especially as to the child. The evidence showed that the deceased, A. D. Johnson, was a young man, just merging into the twenty-ninth year of his life at the time of his death, and that he had a life expectancy of between 36 and 37 years; that his ancestors were subject to no hereditary disease; that his health and physical strength were good, never having been sick in his life; that he was a robust and strong man, and weighed 160 or 170 pounds; that he was in every respect possessed of a sound mind in a sound body; that he was sober, temperate, industrious, hard-working, economical, and diligent; that he was not given to dissipation of any kind or of any form; that he had been in the railroad business and defendant's employ as brakeman for about four years prior to his death, and was at the time of his death head brakeman and receiving a salary of $65 per month; that he was attentive to his business at all times; that he stood well with the defendant, its agents, employes, and officers; that before his death he had sufficiently obtained the confidence of the defendant and its officers as to be intrusted at one time with the duties of baggagemaster, and at another with the duties of passenger conductor on a passenger train of defendant.

The testimony shows, that he worked all the time and was never known to be out of a job, and as one of the witnesses testified, he was regarded as a *good man*; he turned over most all of his money to his wife, and it was appropriated to the benefit of plaintiffs.

Neither of the plaintiffs were subject to any hereditary disease; Mrs. Johnson was 27 years of age at the time of the deceased's death, and the plaintiff Murdie Lee Johnson 2 years old at said time; that plaintiffs had no property or estate, and were dependent alone upon the deceased for their maintenance and support, and that the child was dependent upon its father for its maintenance, nurture, and education.

One of the employes of defendant testified, that he knew the deceased during his life-time and during the time he was in defendant's employment, and that he was regarded as a trustworthy and reliable brakeman, his habits were exemplary, and he was never drunk; was sober and industrious, and was regarded as an extraordinarily good brakeman. The witness considered him so, and he was so considered by everybody who was acquainted with him and who was engaged in the railroad business.

This is the second jury trial. The first jury estimated the damages at $18,000; this on appeal was held excessive. 1 Texas Civ. App., 103. The last jury fixed the damages at $14,452.50, and apportioned $5781 to Mrs. Johnson, and $8671.50 to the child. The apportionment of the damages is a matter which concerns the parties among whom it is divided; the total sum is that in which the railroad company is interested, and about which it may legitimately complain. Is the amount awarded excessive? It does not require technical knowledge of the law to qualify one to estimate the pecuniary loss and damage in such a case; the unprofessional business man is as likely to reach a correct result as the most learned lawyer. In this view the verdict of the jury should have great weight, and should not be set aside unless it is clearly excessive, or there are indications that they were moved by passion or prejudice. There is not the slightest indication that the jury in this case was controlled by passion or prejudice; so far as the record can enlighten us, the trial was not attended with excitement, sensation, or incidents calculated to arouse the feelings and unbalance the judgment. Can we say that this sum is excessive, when the deceased could have earned largely more during the period of his life expectancy, and when the most of his earnings went to the support and maintenance of his wife and child? Can we demonstrate from the evidence that the pecuniary loss and damage of the wife and child is less than the amount awarded by the verdict of the jury? Unless we can do this, we can not safely determine that the verdict is wrong and excessive. We have given most careful consideration to this question, have weighed the evidence in all its phases, and have come to the conclusion, that if we declare this verdict excessive we must do so in the exercise of arbitrary power, and not as a legitimate

deduction from the evidence. This the law does not contemplate that we should do; neither does our sense of justice indicate such a course. We therefore conclude, that the verdict is not excessive. Railway v. Smith, 65 Texas, 167; Railway v. Ormond, 64 Texas, 485; Railway v. Geiger, 79 Texas, 22; Railway v. Johnson, 78 Texas, 542; Railway v. Robertson, 82 Texas, 663; Railway v. Lester, 75 Texas, 56.

There are several other assignments of error relating to the verdict as not conforming to the evidence; the refusal of the court to give requested instructions, etc. We have examined them all carefully, and are of the opinion that they present no reversible error, and that it is not necessary to discuss them. Counsel on both sides of the case have filed able and thorough briefs, which have greatly aided us in the investigation of the case, and from whose statement we have liberally extracted.

Finding no error in the judgment, it is affirmed.

*Affirmed.*

Delivered March 27, 1895.

## ON MOTION FOR REHEARING.

FINLEY, Associate Justice.—We have given careful consideration to the motion for rehearing, and the able printed argument of appellant's counsel in support of the motion; but we find no reason to change our decision of the case. In the printed argument of appellant's counsel upon the motion, it is said: "The court is evidently of the opinion that the award made by the jury in favor of the minor plaintiff is excessive, for the court said: 'The apportionment of the damages is a matter which concerns the parties between whom it is divided. The total sum is that in which the railroad is interested, and about which it may legitimately complain.'"

It was not the intention of the court to convey the idea that the verdict in favor of the minor child was excessive, when considered separately. In our conclusions of fact we found that the plaintiffs were entitled to recover the amounts severally awarded them, and we think that the correct conclusion from the evidence. We meant to convey the idea, that where the evidence showed that the amount of the aggregate recovery was clearly justified by the evidence, that a revisory court should not at the instance of appellant go into the niceties of calculation to determine the comparative rights of the wife and minor child to share in that recovery.

The motion for rehearing is overruled.

*Overruled.*

Delivered May 8, 1895.