The judgment is therefore correct, and is affirmed.

---

ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY

*v.* TROTTER.

Opinion delivered December 4, 1911.

1.  CARRIERS—DUTY AS TO HOLDING TRAIN AT STATION.—In an action by a passenger for personal injuries received in alighting from a train, the court charged the jury: "It is the duty of the railroad company to stop its trains at the station long enough to allow passengers to alight

in safety; it is the duty of the passenger to leave the train with reasonable diligence after it stops, and it is negligence for the carrier to start the train after it stops and before the passengers have had a reasonable time in which to alight." *Held* to state the law correctly. (Page 190.)

2.  Evidence—mortality tables.—Where a physician testified that plaintiff's personal injuries were permanent, it was not error to permit the introduction of mortality tables which were shown to be in general use by the life insurance companies doing business in the State. (Page 192.)

3.  Damages—when not excessive.—Where, before her injuries, plaintiff was a healthy stout girl of 17 years, capable of an earning capacity of a dollar or more a day, but thereafter could not stand or walk straight and suffered continuously when attempting to do so, and with her capacity to do manual labor destroyed, and with no prospect of improvement, an award of $6,000 damages was not excessive. (Page 192.)

Appeal from Lawrence Circuit Court, Eastern District; *R. E. Jeffery,* Judge; affirmed.

STATEMENT BY THE COURT.

Ada Trotter, seventeen years of age, brought this suit by her next friend and stepfather, S. H. McCullough, for damages for a personal injury alleged to have been received, while debarking from a train at Minturn, Arkansas. It was alleged that as soon as the train stopped and the station was called she started to leave the train, but that before she had time to do so it was started with a sudden jerk, and she was thrown violently against the side of the vestibule, and that after moving forward for some distance it was stopped with a sudden jerk, which again threw plaintiff against the side of the vestibule, injuring and bruising her body and back, and that there was no step or stool placed for her to alight, and the station was dark, and she was unable to see that it was not placed, and that in attempting to alight she was thrown to the ground and further bruised and her back strained and injured.

"And she states and alleges that the defendant company was negligent in starting its train before plaintiff had a reasonable time to alight therefrom in safety and in starting the same at an unusual rate of speed and with a sudden jerk and in stopping said train suddenly and in failing to have its platform lighted where passengers were expected to alight from said train and in failing to place the step or stool to facilitate her safe departure from said train, and that each and all of the acts of negligence acted together to cause her injury." That by

reason of the injury she suffered great pain and still continues to suffer, and is advised that she will so continue to suffer during her lifetime.    That she was a strong, healthy girl before the injury and able to perform household duties and out-of-door work and to earn the sum of three hundred dollars per year.    That by reason of said injuries she has been confined to her bed, and has incurred doctor's bill to the amount of seventy-five dollars, and that she has suffered great pain and still suffers, and that she is permanently disabled from performing any manual labor for the remainder of her life.    All to her damage in the sum of $25,000.

The answer denied the material allegations of the complaint, alleged that if the plaintiff had been damaged or injured it was caused by her own contributory negligence and as a result of the risk and hazard which she voluntarily assumed.

The evidence tended to show that she, with her mother, stepfather and the other four children of the family, were passengers on the train from Hoxie to Minturn, Arkansas, on December 6, having first procured tickets for the journey. That her father told the brakeman *en route* that he had his family on the train and wanted time enough to get off.    That the train arrived at Minturn before daylight, about 5 o'clock, and the station was not lighted.    She stated: "When the train came to a full stop, I started to get off immediately, and went straight to the steps.    I got to the second step.    The train started off at once, and throwed my right shoulder up against the end of the coach.    The train run down there to the road crossing, and then come right back.    When it turned to come back, it just come back all at once as hard as ever it could, and then my shoulder was hurt.    My back was hurt.    After it stopped I got off but couldn't stand nor walk without assistance and sat down.    Papa and Mama helped me over to the boarding house, and I felt pain at that time right through the small of my back and in my shoulder.    Still pains yet.    We stayed at Truby's until 12 o'clock, and then we went home.    Dr. Steele was called to Truby's to see me.    They put hay in the wagon, and I lay down on it, and they put quilts over me.    I suffered pain on the way home, principally right up and down the small of my back.    When we got home, they helped me to the house, and put me to bed and I don't remember all that occurred after

that time.   Some of it I remember, and again I don't remember anything.   When I was in my right mind, I was suffering pain in my shoulder and back.   They said I was sick two months.   It has been about three weeks since I got up so I could sit up. Since I have got able to walk by myself, I can't tell that I am improving a bit.   I feel pain now in my hips and back.   Don't bother me anywhere else, just in my back and pains go just like knives sticking in my back.   When I am sitting still, I don't suffer at all; just let me get up and go walking, and I suffer in my back.   I can't straighten up nor walk straight.   When I walked over here to the witness stand, I was walking just as straight as I can walk.   I try to walk straight and I can't. Dr. Steele waited on me until I got up.   I was up the last time he came.   Before the accident I was always healthy and well; never was sick, and walked straight, and had no trouble with my back."

The fourteen-year-old sister of the plaintiff was not injured, and she was standing behind her at the time of the injury, but had nothing in her arms to prevent her holding while the plaintiff said she had her father's overcoat and "some other things, had my arms full, is the reason I couldn't hold."

It was shown that when the train first stopped some passengers and Mr. McCullough, with a child in his arms, got off. The porter said "All right!" and, as the brakeman said, "the train started before the lady folks got off; some one of the girls, this Miss Trotter, I believe it was, tried to come down the steps, and I jumped on, got hold of the hand rails and held her until the train stopped.   I told the auditor to pull the air, and we just pulled up a car length and stopped, and let them off without any jar or any accident that I could see.   Nobody was thrown down on that occasion nor was there any unusual jerk or jar.   The train pulled down a car length before it made the second stop, and didn't back up any, and nobody made any complaint whatever.

The conductor of the train testified that the train came to a stop, and he went to the baggage car to see to the loading and unloading of the baggage, and after it was done there was apparently no one else to get off the chair car, and the porter holloed "All right!" that he was through, and I gave the signal for the engineer to move which he did.   He moved a car length

up to the time he stopped. I saw these other people get off. There was no jerk nor jar of the train that I know of. The porter was standing right even with the baggage car door when he holloed "All right!" and the brakeman was down where the passengers were alighting.

The baggageman also testified that on the occasion of the stop at Minturn none of the baggage was jarred down in the car, which was right behind the engine. That it was a very unusual thing to have baggage jarred down.

The auditor testified that the train stopped at Minturn on this morning. That there were six or seven passengers unloaded, and he found there were several more to get off the train, and the train was brought to a stop, and the passengers were let off. The train didn't back up any, nor was there any unusual jerk or jar. Nobody was thrown down on that occasion, and nobody made any complaint. It is unusual for the train to start off before all the passengers get off. I think there were both men and women got off of the train. I remember especially a gentleman getting off with a child in his arms. I am not supposed to know where the porter was, but surmise he was unloading baggage. After the train started the first time, I noticed these several women still wanting to get off, and I called the brakeman's attention to the fact, and he said: "Pull the cord twice," which I did.

The mortuary tables showing life expectancy were introduced by the agent of the life insurance company, and showed expectancy of a girl 17 years old 44.19 years and at 18, 43.53 years. He testified that the table was given by the National Life Insurance Company of the United States, but that the Equitable and the Missouri State Life and all others were the same.

Dr. Steele testified: "I was called to attend Ada Trotter about December 6 at Minturn at Mr. Truby's house. I found her very nervous and excited, and she complained of her shoulder and hip and back being hurt and bruised. I found that the hide was skinned, and was very much irritated and bruised. Bruises were on the right shoulder and left hip and small of her back, and her flesh was discolored. I waited on her after that, and the last time I made a call on her was January 29 last. She has been under my treatment nearly ever since.

After they took her home from Minturn, I went out to see her on the 8th, and she had a very high fever; fever 104, and her fever continued that way from 102½ to 103½ and 104 up until the latter part of December; then it abated a little, and came back again.    Then she took erysipelas, starting from the injury on her back, and it extended up her back to the chest, and her temperature then was 103 and 103½.    The rise in her temperature was caused from the erysipelas.    Before the erysipelas, I suppose the rise in the temperature was caused from the bruises; there was no other cause for it that I could find.    Very deep seated bruise does cause fever of that kind.    During the time I was waiting on her there was continuous severe pain.    Since that she has got able to get up and walk about.    I have seen her twice, and the last time I saw her when she was at home I examined her.    I have seen her since she has been here at court.    Since she got up able to walk, there has been very slight improvement.    It is my opinion that the injury will be permanent; don't hardly think she will ever be well enough to do manual labor.    In those cases as a rule, the pain will get slighter, but at any change or anything that would occur it would come back on her.    I think the second time I saw her was on December 8, and the last time January 29."

Dr. S. S. Stewart, division surgeon for the railroad company, testified that he made a professional examination of the plaintiff on December 28 after the injury, at her home in company with Dr. Steele, her attending physician, and found the young lady lying in bed with her clothes on; she was lying on her left side with the left hip bent and the left knee bent; she had a temperature of 102.2 degrees; was complaining of headache and general feeling of illness and soreness over her entire person, or practically so, and of pain on being touched on any portion of her body.    "She stated that she was unable to lie or rest in any other position than that in which I found her; that is lying on her left side with her thigh, or rather the hip and knee bent, each to about a right angle; her spinal column was inclined slightly to the right side; after further examination and removing her clothing to the waist, and while having her to lie flat on her back, she said she was more comfortable than in the position in which I first found her.    There was no discoloration of the spine and no injury to the bones or ligaments that I

could find; she was evidently quite ill, however; feeling uncomfortable, suffering, no doubt. I found no signs of injury. Wherever I touched her, she complained of pain; but there was no visible sign, nothing I could see with my eyes or feel with my fingers to indicate that there was an injury. It is possible for injuries to the spine to exist without marked external evidence of it. I did not find any evidence of any permanent injury, but I must say, however, that I was not able to diagnose the cause of the fever."

The court instructed the jury, including, over defendant's objections, instructions numbered 3 and 4 for the plaintiff.

The jury assessed plaintiff's damages at six thousand dollars, and from the judgment defendant appealed.

*W. E. Hemingway, E. B. Kinsworthy, James H. Stevenson* and *S. D. Campbell,* for appellant.

1. The court erred in admitting testimony to the effect that since the alleged injury the condition of appellee as to her monthly periods was bad, and that she had suffered from it. Such testimony was incompetent because (a) there was no foundation laid in the complaint for it. 85 Ark. 325. And (b) there is no causal relation shown as to the occurrence at Minturn and the condition of the girl as to her monthly periods. It also erred in admitting the testimony of the witness Moore as to the expectancy of appellee. 69 Atl. 968.

2. The third instruction given at appellee's request is erroneous in that by the use of the word "sufficient" as to the time a train should stop, it is left absolutely with the passenger as to when he will leave a train at the station, and a subsequent clause defining the duty of the company, leaves him the unconditional judge as to whether or not the train has been held still long enough for him to alight in safety. The principle of reasonableness is entirely ignored. 73 Ark. 551; 99 Ark. 366. The fourth instruction is erroneous in the use of the language (a) "and the increased expenses she will probably incur on account of her injury during her expectancy;" and (b) "and all damages for past, present and future pain which she now experiences, has experienced or may experience." 69 Ark. 384.

*Smith & Blackford,* for appellee.

1. The complaint alleged past, present and future pain, and relied on same as a part of the measure of damages. The fact that at certain times plaintiff suffered more than at others was certainly competent, without alleging in the complaint all the circumstances connected with the suffering. Mortality tables are admissible and recognized by this court as a means of proving life expectancy. 76 Ark. 233.

2. There is no error in instruction 3. In connection with the language objected to, it also expressly charged the jury that it was the passenger's duty to leave the train with reasonable diligence after it stopped. Instruction 4 is correct. 60 Ark. 486.

Kirby, J., (after stating the facts). It is contended here that the court erred in giving said instructions for the plaintiff, and in refusing to give certain instructions for the defendant, and that the amount of the verdict is excessive.

Appellant especially objected to that part of instruction number 3 which declares: "It is the duty of the railroad company to stop its trains at the station a sufficient length of time and to hold it still long enough to allow passengers to alight in safety;" and if that were all of the instruction, and nothing else had been given explanatory of it, the objection would not be ill-founded, but it further declares: "It is the duty of the passenger to leave the train with reasonable diligence after it stops, and it is negligence for the carrier to start the train after it stops and before the passengers have had a reasonable time in which to alight."

In *Barringer* v. *St. Louis, I. M. & Ry. Co.* 73 Ark. 551, the court said: "But the law is that it is the duty of carriers to allow their passengers a reasonable opportunity of getting on and off their trains, and they must stop at stations long enough for that purpose; (citing cases). A reasonable time is such time as a person of ordinary care and prudence should be allowed to take. * * * It is the duty of the carrier, in determining what is a reasonable time, to take into consideration any special condition peculiar to any passenger and to the surroundings at the station, and to give a reasonable time under the existing circumstances, as they are known or should be known by its servants, for a passenger to get on or off its trains."

In *Kansas City So. Ry. Co.* v. *Worthington, ante* p. 128, the court said:

"It is well settled, we think, that it is the duty of a railroad company as a carrier of passengers to stop its trains at a station which by its regulations it has designated as a place for stopping, and to there remain for a sufficient time to permit its passengers, in the exercise of ordinary diligence and care, to safely leave its trains. The passenger must not only be carried properly and safely, but he must be carried to the end of his journey for which he has paid his fare, and he must be put down at the usual stopping place at the end of such journey."

So this instruction, although it declares the duty of the railroad company to stop its trains at its stations a sufficient length of time to allow passengers to alight in safety, further explains that it is the duty of the passenger to leave the train with reasonable diligence after it stops, and only declares it negligence for the carrier to start its train after it stops and before the passengers have had a reasonable time in which to alight, and amounts to but saying that the passenger shall be given a reasonable opportunity to alight while in the exercise of reasonable diligence to do so, and the court committed no error in giving it.

We do not think appellant's requested instruction numbered 3 was correct; but, if it had been, no prejudice resulted to it because of the court's refusal to give it, since the court on its own motion correctly declared the law defining contributory negligence and relating to the defense thereof.

It is true that no witness testified that plaintiff would probably incur increased expense in the future during her life expectancy on account of the injury, but the physician thought the injury was permanent, and the testimony showed it would be accompanied with more or less pain, and especially during the periods of menstruation; and while increased expenses might not be inferable because of it, no prejudice resulted to appellant unless the verdict is excessive.

It is contended also that the court erred in permitting the introduction of certain life or mortality tables not authenticated. The agent of a life insurance company testified that the tables were given by the National Life Insurance Company of the United States; that he did not know what tables they were,

but that they were the same as used by the Equitable, the Missouri State Life and all others.

Life or mortality tables are competent evidence, and it is the common practice to introduce them to prove the probable expectancy or duration of the life of the person injured, although it is not necessary to do so, since the jury may determine that from the age, health, habits and other facts which affect its probable continuance, etc. (*Kansas City So. Ry. Co.* v. *Morris*, 80 Ark. 533), and no error was committed in the introduction of these tables, which were shown to be in general use by the life insurance companies doing business in the State. *Miss. & T. R. Co.* v. *Ayres*, 16 Lea (Tenn.) 725; *Central Railroad* v. *Richards*, 62 Ga. 306; *Pearl* v. *Ry.*, 115 Iowa 541, 88 N. W. 1078; *Gulf, C. & O. Ry.* v. *Johnson*, 10 Tex. Civ. App. 254, 31 S. W. 255; 8 Ency. of Evidence, p. 642.

It is strongly urged that the plaintiff was injured but slightly, if at all, and that the verdict is excessive. The testimony shows that the plaintiff was 17 years old at the time of the injury, well and healthy and walked erectly. As her father said, before the injury she was a stout portly woman, stood straight and walked straight, and worked at anything there was to do, hoeing, chopping or picking cotton, or any farm work or work about the house, with an earning capacity at manual labor of a dollar or more a day; since the injury she can not straighten up or stand straight or walk straight, and suffers continuously when attempting to do so, and, according to the physician, her injury is probably permanent, and her capacity to do manual labor destroyed.

Necessarily, her chances for contracting a happy marriage and fulfilling the destiny of woman are materially lessened, of not altogether blighted, and we can not say under the circumstances that, for an injury which caused a stout, healthy girl of 17 years, portly and erect before, two months' suffering and confinement to her bed, leaving her bent and misshapen, unable to stand or walk straight and suffering pain continuously when attempting to do so, with prospect of no improvement and continued inability to perform manual labor throughout her life expectancy, the assessment of six thousand dollars damages by the jury was excessive. Finding no prejudicial error, the judgment is affirmed.